**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Tushar Bhatia, individually and as the representative of a class of similarly situated persons, and on behalf of the McKinsey & Company, Inc. (PSRP) Profit-Sharing Retirement Plan and the McKinsey & Company, Inc. (MPPP) Money Purchase Pension Plan,<br><br>        Plaintiff,<br><br>v.<br><br>McKinsey & Company, Inc., MIO Partners, Inc., and John Does 1-50,<br><br>        Defendants. | No. 1:19-cv-1466<br><br><br>**CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.    Plaintiff Tushar Bhatia ("Plaintiff"), individually and as the representative of the Class described herein, and on behalf of the McKinsey & Company, Inc. (PSRP) Profit-Sharing Retirement Plan and the McKinsey & Company, Inc. (MPPP) Money Purchase Pension Plan (the "Plans"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendants McKinsey & Company Inc. ("McKinsey"), MIO Partners, Inc. ("MIO"), and John Does 1-50 (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties and engaged in other unlawful conduct to the detriment of Plaintiff and the Class. Plaintiff brings this action to recover losses caused by Defendants' unlawful conduct, prevent further similar conduct, and obtain equitable and other relief as provided by ERISA.

1

## PRELIMINARY STATEMENT

2.      McKinsey sponsors two defined contribution retirement plans for its employees, which are the Plans at issue in this action. McKinsey retained its subsidiary, MIO, to manage the Plans' investment menu.

3.      McKinsey and MIO have made the Plans two of the most expensive—if not the most expensive—defined contribution plans in the country among plans of similar size. As of 2015 (the most recent comprehensive study), the median annual cost of a 401(k) plan with more than $1 billion in assets (like the Plans) was 0.27% of assets, and the 90th percentile mark was 0.51%. The Plans' annual cost was at least 3.74% of assets—more than 13 times the median, and 7 times the 90th percentile mark.

4.      The added cost did not bolster participants' investment returns. Instead, the Plans performed in the bottom 5% compared to peer plans, and trailed the median by more than 2.15% per year, between 2013 and 2017 (the most recent five-year period with comparative data).

5.      Defendants maintained this high-cost, poor performing program for their own benefit and the benefit of McKinsey partners, not in the interest of the Plans' participants.

6.      MIO only gets paid if it offers its own its own proprietary investment portfolios in the Plans. MIO's portfolios have high costs and are rife with other problems (see *infra*, ¶¶ 41-59). Yet, MIO has failed to consider replacing its portfolios with superior alternatives.  Inclusion of MIO-managed investment options has enriched MIO substantially—since 2013, MIO's annual compensation from the Plans has ranged from $20 million to $36 million, or 0.64% to 0.94% of MIO-managed assets.

7.     McKinsey and its owners/partners also benefit handsomely from the Plans' management. McKinsey's partners (current and former) have more than $4 billion invested with MIO through private funds outside the Plans. MIO routinely invests the Plans' portfolios alongside partners' personal funds in order to subsidize or defray partners' expenses in these funds. Indeed, the Plans' participants pay MIO annual management fees of close to 1.00% of the assets MIO oversees, yet MIO offers the exact same services, and makes the *same* investments, for McKinsey's partners at *no cost* to the partners. As a result, the Plans are effectively paying for the free investment services that MIO is providing to McKinsey's partners. Had McKinsey's partners simply paid their fair share of MIO's expenses, the Plans would have saved over $70 million in fees since 2013.

8.     Moreover, McKinsey has failed to appropriately monitor and control the Plans' recordkeeping expenses, and has paid a portion of these charges to itself. Each participant pays approximately $95 per year or more for recordkeeping services (out of a total $160 annual administrative charge). This is more than twice the reasonable market rate for similarly-sized plans (approximately $30 to $40 per participant), and McKinsey improperly retains around 25% of the recordkeeping charge for itself. Notably, while industry-wide recordkeeping expenses were cut in half on a per-participant between 2006 and 2016, the Plans' per-participant recordkeeping fee in 2017 was fifty percent *higher* than it was in 2006, despite significant growth in the number of participants that should have translated into *lower* per-participant fees. Thus, the recordkeeping fees charged to the Plan are not only excessive, but have grown worse over time.

9.     As fiduciaries to the Plans, Defendants are subject to ERISA's strict duties of loyalty and prudence. *See* 29 U.S.C. § 1104(a)(1).  Defendants must act "solely in the interest of

the participants and beneficiaries," for the "purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan,"  and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1).  These fiduciary duties are "the highest known to the law." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

10.    Based on the conduct described in this Complaint, Defendants have not acted in the interest of the Plans' participants, or followed prudent processes to advance participants' interests or defray participants' costs. As a result of Defendants' failures, the Plans' participants have paid millions of dollars of unreasonable and inappropriate expenses, and suffered millions of dollars in lost investment returns.

11.    Based on the conduct described herein, Plaintiff asserts ERISA claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count I) and prohibited transactions (Counts III-IV), and against McKinsey for failure to monitor other fiduciaries (Count II).

## JURISDICTION AND VENUE

12.    Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide, among other things, that participants in an employer-sponsored retirement plan may pursue a civil action to redress violations of ERISA, recover losses resulting from a fiduciary breach, restore profits made by fiduciary self-dealing, and obtain appropriate equitable relief, as set forth in 29 U.S.C. §§ 1109 and 1132.

13.    This case presents a federal questions under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

14.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because the Plans are administered in this district.

## THE PARTIES

### PLAINTIFF

15.     Plaintiff resides in Seattle, Washington. He is a current participant in the Plans, and has been since 2015. Through the Plans, he has been invested in several options, including proprietary MIO portfolios. After a target-date fund series became available in October 2017, Plaintiff moved the entirety of his account balance to the target-date option.

### THE PLANS

16.     The McKinsey & Company, Inc. (PSRP) Profit-Sharing Retirement Plan (the "PSRP") was established by McKinsey & Company, Inc. in 1956. The PSRP is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The PSRP covers nearly all full- and part-time employees of McKinsey and its subsidiaries. Eligible employees saving for retirement may contribute a percentage of their earnings on a pre-tax basis, and additional amounts on an after-tax basis. Employees may also receive tax-deferred contributions from McKinsey, in its discretion. As of the end of 2017, the PSRP had more than $5.2 billion in net assets and 24,289 participants with account balances.

17.     The McKinsey & Company, Inc. (MPPP) Money Purchase Pension Plan (the "MPPP") was established by McKinsey in 1994. The MPPP is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34)." The MPPP covers nearly all full- and part-time employees of McKinsey and its subsidiaries. McKinsey contributes 5% of employees' qualified compensation

on their behalf, up to certain limits based on job classification. As of the end of 2017, the MPPP

had more than $1 billion in net assets and 17,780 participants with account balances.

18.     Defendants administer the Plans side-by-side. Participants receive a single

consolidated statement for the Plans, and each Plan offers the same menu of investment options.

Participants may only change their investment allocation once per year. The Plans' investment

assets are held in a common funding vehicle called the McKinsey Master Retirement Trust (the

"MMRT").[1]

### DEFENDANTS

19.     McKinsey is a privately-owned consulting firm headquartered in New York City,

and is owned by around 2,000 individual shareholders, often referred to (and referred to herein)

as the firm's "partners". McKinsey is controlled by its Board of Directors (the "McKinsey

Board"). The McKinsey Board is comprised of current and former McKinsey partners.

20.     The McKinsey Board controls the Plans' overall policy and design (through its

Finance Committee and Partner Compensation Policy Committee), and designates individual

McKinsey officers (collectively, the "trustees") to implement the Plans' investment and

administrative programs. McKinsey and the trustees have retained MIO to manage the Plans'

investment lineup since the 1990s (if not earlier). McKinsey acts as a fiduciary to the Plans under

29 U.S.C. § 1002(21)(A) because it exercises discretionary authority with respect to management

and administration of the Plans and the management and disposition of the Plans' assets.

21.     MIO is a registered investment adviser firm wholly-owned by McKinsey and

headquartered in New York City. MIO was established by McKinsey in 1986 as Paul Harris

---

[1] More than 99.7% of PRSP net assets are held in the MMRT, along with more than 97.8% of
MPPP net assets. Combined, the Plans make up 98.9% of the MMRT. The other 1.1% of the
MMRT is a new defined benefit plan (i.e., pension plan) established in 2016 offered exclusively
to McKinsey's partners.

Management, Inc., and changed its name to MIO (McKinsey Investment Office) in 2003. MIO is controlled by its Board of Directors (the "MIO Board"). The MIO Board is comprised of current and former McKinsey partners. All MIO clients are affiliated with McKinsey—it does not have any outside clients.

22.     MIO is the Plans' investment manager (by McKinsey's appointment). MIO serves the Plans by deciding what investment options should be selected and retained in the Plans. MIO also manages certain proprietary investment portfolios that it has retained as investment options in the Plans. The MIO Board "sets the mandate for MIO's services", and delegates specific investment decisions to MIO's officers and portfolio managers. MIO acts as a fiduciary to the Plans under 29 U.S.C. § 1002(38) because it has the power to manage, acquire, and dispose of assets of the Plans. MIO also acts as a fiduciary to the Plans' pursuant to 29 U.S.C. § 1002(21)(A) because it exercises discretionary authority with respect to the disposition of Plans' assets, and renders investment advice for compensation with respect to property of the Plans (to the extent that MIO does not have complete discretion to dispose of such property).

23.     John Does 1-50 are individual McKinsey officers appointed as the Plans' trustees (see *supra*, ¶ 20), other McKinsey officers appointed by the trustees to perform fiduciary functions in regard to the Plans (see *id.*), and individual MIO directors, officers, and managers responsible for carrying out fiduciary functions in regard to the Plans (see *supra*, ¶ 22). The identities of all such individual trustees, directors, officers, and managers are not known to Plaintiffs at this time. John Does 1-50 acted as fiduciaries to the Plans pursuant to 29 U.S.C. § 1002(21)(A) or 29 U.S.C. § 1002(38).

# BACKGROUND

## PARTNERS & MIO

24.     MIO offers a number of special perks for McKinsey partners. Perhaps most notably, MIO manages several private investment funds[2] available exclusively to current and former partners. MIO broadly categorizes these partner funds as "hedge funds" or "private equity funds". More than 1,000 current and former McKinsey partners have invested in MIO's private investment funds. The partners' stake in these funds is worth over $4 billion combined.

25.     MIO invests the partners' private funds through a combination of direct trading, placements with unaffiliated managers, and MIO-controlled companies that acquire and hold assets on behalf of the funds. The funds generally bear trading costs and the expenses of underlying managers and companies. In addition, MIO is entitled to charge a fee for its services to partners' funds, but has waived its fee in regard to partner funds (see *infra*, ¶¶ 55-57). Partners invested in fee-waived funds pay only the underlying expenses, and receive the benefit of MIO's services selecting and monitoring the underlying investments at no charge.

26.     MIO also provides McKinsey partners and their families with financial advice free of charge. This includes personalized advice regarding their overall investment portfolio, financial plan, and how MIO's private funds may help them achieve their financial goals. Former McKinsey partners also may receive free financial planning advice from MIO. Around 450 McKinsey partners received personalized advice from MIO during the most recently reported year.

---

[2] In the past, MIO registered McKinsey partners' funds under the Investment Company Act of 1940 (e.g., the Partners Income Fund). Since the early 2000s, MIO has transferred all partner investments to private funds, and deposited all new investments in private funds. As a result, very little information about MIO fund operations and investments is public. Details regarding private fund fees and expenses, or specific underlying investments, are generally only revealed through subsequent litigation or admissions by underlying investments (see *infra*, ¶¶ 47-54).

### THE PLANS & MIO

27.     MIO is also responsible for maintaining the menu of investment options available to participants in the Plans. However, MIO does not provide personal financial planning or investment advice to the Plans' participants, as it does for McKinsey's partners.

28.     Prior to October 2017, the Plans' menu consisted of MIO-managed multi-asset class portfolios and single-asset class options managed by unaffiliated firms. Since October 2017, the menu also has included target-date funds managed by an unaffiliated manager.[3]

29.     MIO does not impose a charge for its service managing the Plans' menu. Instead, MIO exclusively collects revenue from its proprietary portfolios. Thus, in designing the Plans' investment menu, MIO must include its proprietary portfolios, and must charge participants who invest in them, in order to receive revenue in connection with its services to the Plans.

30.     Not coincidentally, the Plans' investment menu has maintained a heavy dose of proprietary funds. During the past six years, MIO has reorganized its proprietary portfolios by closing options, renaming options, and folding options into other options. Yet, despite the reorganizations, the share of the Plans' assets held within MIO-managed portfolios has remained remarkably consistent—between 61% and 67% of total Plan assets.

31.     The Plans are the only defined contribution plans in the country (out of more than 650,000 total) that have retained MIO as an investment manager and have utilized these MIO-managed portfolios. No other plan uses these proprietary portfolios.

32.     MIO's year-by-year revenue from the Plans during this time ranged from $20 million to $36 million, or 0.64% to 0.94% of MIO-managed assets, and 0.42% to 0.61% of the Plans' total assets.[4] The high mark was 2017 ($36 million, 0.94%, and 0.61%, respectively).

---

[3] Target-date funds are multi-asset class funds comprised mostly of stocks and bonds that reallocate between asset classes as participants approach retirement age.

## DEFENDANTS' VIOLATIONS OF ERISA

33.     Defendants perform their duties with respect to the Plans in a fiduciary capacity. Defendants are bound by the twin fiduciary duties of loyalty and prudence outlined in 29 U.S.C. § 1104(a).  These duties are "the highest known to the law." *See supra*, ¶ 9.

34.     "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display ... complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (quotation marks and citations omitted).

35.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (citation and internal quotation marks omitted). A fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (citation and internal quotation marks omitted). This duty applies to each option in a plan's investment menu. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) ("[A] fiduciary must initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants.") (emphasis in opinion).

36.     ERISA's fiduciary duties are "borrowed … from the common law[.]" *C. States, S.E. and S.W. Areas Pension Fund v. C. Transport, Inc.*, 472 U.S. 559, 572 (1985); *see also Donovan v. Bierwirth*, 754 F.2d 1049, 1055 (2d Cir. 1985) ("We … look to principles developed

---

[4] MIO's charge does not include the underlying expenses of its portfolios, which the Plans' participants also pay.

under the common law of trusts, which in large measure remain applicable under ERISA.").

Pursuant to trust law's prudent investor rule, fiduciaries are required to "incur only costs that are

reasonable in amount and appropriate to the investment responsibilities of the trusteeship."

Restatement (Third) of Trusts § 90(c)(3) (2007); *see also id.* § 90 cmt. b ("[C]ost-conscious

management is fundamental to prudence in the investment function . . . ."). The Introductory

Note to the Restatement's chapter on trust investment further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent
> investor rule. This is done to reflect the importance of market-efficiency concepts
> and differences in the degrees of efficiency and inefficiency in various markets. In
> addition, this emphasis reflects the availability and continuing emergence of
> modern investment products, not only with significantly varied characteristics but
> also with similar products being offered with significantly differing costs. The
> duty to be cost conscious requires attention to such matters as the cumulation of
> fiduciary commissions with agent fees or the purchase and management charges
> associated with mutual funds and other pooled-investment vehicles. In addition,
> active management strategies involve investigation expenses and other transaction
> costs . . . that must be considered, realistically, in relation to the likelihood of
> increased return from such strategies.

*Id.*, ch. 17, intro. note (2007).

37.     ERISA also requires fiduciaries to limit administrative expenses. 29 U.S.C. §

1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties … solely in the interest of

participants … for the exclusive purpose of[] providing benefits … *and defraying reasonable*

*expenses of administering the plan*[.]"). A fiduciary may breach this duty by authorizing higher-

than-market recordkeeping fees or maintaining a recordkeeping deal for its own benefit. *See*

*Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (affirming judgment against plan sponsor

based on "overpaying" recordkeeper and benefiting from the overpayment); *George v. Kraft*

*Foods Glob., Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (failure to solicit bids, and higher-than-

market recordkeeping fees, supported triable fiduciary breach claim).

38.     Defendants breached their fiduciary duties to the Plans, and violated other provisions of ERISA (see *infra*, Counts III & IV), in several respects.

**DEFENDANTS' FAILED TO PRUDENTLY MONITOR INVESTMENT COSTS AND PERFORMANCE**

39.     One of the ways that Defendants breached their fiduciary duties was by failing to appropriately monitor the Plans' investment expenses and performance.

40.     In 2012, the median *total* cost for mega plans with $1 billion or more in assets was 0.30%, and the 90th percentile mark was 0.52%.[5] In 2015, it was 0.27% and 0.51%.[6] Moreover, it is widely believed that large plan costs continued to decrease after 2015 (the most recent year with comprehensive analysis).[7]

41.     MIO collected more fees from the Plans *for its services alone* than the median plan with $1 billion or more in assets paid in total. Between 2013 and 2017 (the most recently reported year), MIO charged the Plans between 0.42% to 0.61% of total assets, with a peak in 2017, when MIO eclipsed the median by a factor of two, and surpassed the 90th percentile mark.

42.     MIO's costs were only a fraction of the Plans' total costs. Defendants burdened the Plans with substantial additional costs for the underlying expenses of MIO-managed portfolios, other investment expenses, and recordkeeping and other administrative services. In

---

[5] ICI/BRIGHTSCOPE, *A Close Look at 401(k) Plans*, at 42 (Dec. 2014), *available at* https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (last visited Feb. 13, 2019).
[6] ICI/BRIGHTSCOPE, *A Close Look at 401(k) Plans*, at 54 (Mar. 2018), *available at* https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf (last visited Feb. 13, 2019) (hereinafter "ICI/BRIGHTSCOPE 2018").
[7] The authors of *A Close Look* update their report annually. The next report will examine comprehensive data through 2016. Sample studies show costs continued to decrease after 2015. *See* PLANSPONSOR, *New 401(k) Averages Book Continues to Show Larger Plans Pay Lower Fees* (Feb. 20, 2018), *available at* https://www.plansponsor.com/new-401k-averages-book-continues-show-larger-plans-pay-lower-fees/ (last visited Feb. 13, 2019); *see also* CALLAN INSTITUTE, *2018 Defined Contribution Plan Trends*, at 2-4 (2018) (survey of large plans, most with $1 billion or more in assets, found that 41% reduced costs in the last year), *available at* https://www.callan.com/wp-content/uploads/2018/01/Callan-2018-DC-Survey.pdf (last visited Feb. 13, 2019) (hereinafter, "*Defined Contribution Plan Trends*").

total, the Plans cost at least 3.74% in 2017,[8] more than 13 times the median (*supra*, ¶ 40), and 7 times the 90th percentile (*id.*).

43.    The Plans' extra costs did not result in extra returns. The Plans' net investment returns have consistently trailed peer plans over recent 5-year periods. Indeed, compared to a universe of 674 peer plans with comparable data,[9] the Plans have consistently ranked in the bottom 3%-28% in average annual investment performance:

| | **2011-2015** <br><br> *Avg. Ann. Net Return / Percentile Rank* | **2012-2016** <br><br> *Avg. Ann. Net Return / Percentile Rank* | **2013-2017** <br><br> *Avg. Ann. Net Return / Percentile Rank* |
|---|---|---|---|
| **Median Plan** | 6.89% / 50% | 8.65% / 50% | 9.55% / 50% |
| **PSRP** | 6.46% / 28% | 7.00% / 8% | 7.38% / 5% |
| **MPPP** | 6.13% / 18% | 6.51% / 5% | 6.57% / 3% |

44.    A prudent and loyal fiduciary acting in the best interest of the Plans would not have maintained MIO's proprietary portfolios in the Plans. The investment marketplace was replete with actively-managed, return-seeking funds offered by leading managers that consistently outperformed MIO's portfolios—at around one-tenth (or less) of the cost. For example, the Vanguard Wellington Fund is an actively-managed balanced fund investing in a mix of stocks and bonds that hundreds of fiduciaries managing defined contribution plans with over $250 million in assets have elected to include in their plan's investment lineup. While Vanguard Wellington has earned gross returns comparable to those of MIO-managed options, because the Vanguard Wellington Fund charges fees of only 0.17% per year (compared to the 3 to 4 percent paid by the Plans' participants), its investors earned returns of 10.86% per year

---

[8] After a full accounting, the Plans' total costs in 2017 may have been higher than 3.74%.
[9] This sample includes defined contribution plans with at least $350 million in assets as of the end of 2011, complete Form 5500 filings for each year 2011-2017, a 1/1-12/31 plan accounting year, and no investment in employer stock. The 2017 data is the most recent data available.

between 2013 and 2017, about 3.5% better on an annual basis than the Plans' participants fared at comparable levels of risk.

45. Defendants could have replaced MIO's portfolios with such superior alternatives, or developed custom investment strategies with a highly qualified unaffiliated manager at a fraction of MIO's cost, and a fraction of the total expense ratio of MIO-managed portfolios, which reached as high as 6.07% of portfolio assets. Either route would have materially improved participants' returns at appropriate levels of risk, resulting in better outcomes for the Plans' participants.

### DEFENDANTS IMPRUDENTLY MAINTAINED THE PLANS' HIGH COST, POOR PERFORMING PROGRAM TO BENEFIT THEMSELVES AND MCKINSEY PARTNERS.

46. The duty of prudence requires Defendants to consider the Plans' expenses in relation to participants' needs and expected returns (see *supra*, ¶¶ 34-37). By those measures, Defendants are woefully out of step (*see supra*, ¶¶ 40-44). Defendants either failed to prudently monitor the Plans' costs and performance, or favored themselves and McKinsey's partners over the Plans' participants by design.

### *MIO pursues joint investments imprudently and for the benefit of McKinsey partners*

47. As noted above, MIO controls the investment of assets allocated to the MIO-managed portfolios available in the Plans. As an illustration, MIO has placed a large portion of the Plans' assets in an offshore limited company called SSALT Fund, Limited (hereinafter, "SSALT").[10] MIO is the investment manager of SSALT, and SSALT's directors are MIO officers. Through SSALT, MIO places investments with other companies controlled by MIO, and with other investment managers.

---

[10] SSALT is organized under the laws of the Bailiwick of Guernsey.

14

48.     MIO has a practice of combining SSALT investments on behalf of the Plans with investments made on behalf of McKinsey partners' funds (see *supra*, ¶¶ 24-26). For example, on behalf of the Plans, SSALT owns around 51% of a United Kingdom company called Limited Life Assets Master Limited (hereinafter, "Limited Life"). Three McKinsey private partner funds own the rest.[11]

49.     MIO also invests the Plans' assets alongside McKinsey partner funds through placements with other managers. For example, MIO placed investments with a firm called ESM Management (hereinafter, "ESM") on behalf of the Plans (through another MIO-controlled company owned by SSALT called Compass Offshore MAV Limited), and on behalf of McKinsey partners (through a MIO-controlled company called Compass MAV LLC). ESM's principal officer testified that ESM "tr[ies] to maintain the same strategy between the two", and that the Plans' fund and the partners' private fund are "like sister companies".[12]

50.     MIO's joint investments are designed for partners, not the Plans' participants. Partners are MIO's longest tenured and highest-paid employees. MIO has collected decades of personal financial and investment information from them and their families. In turn, MIO has created specialized investment strategies to help them pursue their financial goals, and provides personalized advice in that regard. MIO does not have the same information regarding the Plans' participants, and does not provide the same personalized service. Instead, MIO brazenly assumes participants should tag along with specialized investments designed for McKinsey partners.

---

[11] Limited Life itself is an MIO-controlled company, organized by MIO officers to acquire a specific portfolio of secondary market life insurance contracts. These are insurance contracts on the natural lives of individuals other than the Plans' participants or McKinsey partners.
[12] *See Compass MAV LLC v. The Bank of New York Mellon Trust Company, N.A.*, Case No. 161200182, Deposition of Eric Meyer, 520:7-13 (Phila. Cnty. Ct. Common Pleas Nov. 18, 2018) (hereinafter "*Compass MAV*, Meyer Dep.").

51.    By considering the interests of McKinsey's partners ahead of (and to the exclusion of) ordinary Plan participants, MIO has failed to invest "solely in the interest of participants", and act with the "care, skill, prudence, and diligence" required of a retirement plan fiduciary when investing on the behalf of the Plans. *See supra*, ¶ 9. These fiduciary breaches have resulted in significant losses to the Plans.

52.    As an illustration, MIO acquired the secondary market life insurance portfolio held by Limited Life (a) from the seller's bankruptcy estate,[13] (b) after losing around $90 million to the seller in a prior venture,[14] (c) without a "due diligence out" (a distinguishing factor per the seller's broker),[15] and (d) after its bid was shopped to "all" potential purchasers, and no other firm made an offer.[16] Following this acquisition, the Plans suffered tremendous losses in Limited Life, but MIO has, year after year, thrown good money after bad by investing an additional $60 million in Limited Life since 2013, even as the Plans' investment has continued to dwindle in value. Regardless of whether McKinsey partners may have considered this an attractive investment opportunity for them, MIO did not meet ERISA's standards in failing to conduct due diligence before making the investment on behalf of the Plans, and should not have continued to funnel the Plans' money into the Limited Life investment as it continued to lose value.

53.    Another illustration is MIO's investment with ESM. MIO invested with ESM approximately six months after the firm was established, and MIO represented as high as 80% of ESM's assets under management.[17] ESM's principal officer obtained MIO's business after

---

[13] *See In re New Stream Secured Capital, Inc.*, Case No. 11-10753, Hearing Tr. 5/16/11, ECF No. 347 (D. Del. Bankr. May 18, 2011) (hereinafter "*In Re New Stream*").

[14] *See USA v. Bryson*, Case No. 3:13-cr-41, Hearing Tr. 11/21/14, 1085:15-1086:9, ECF No. 333 (D. Conn. Nov. 30, 2014).

[15] *See In re New Stream*, Hearing Tr. 3/15/11, 117:15-118:5, ECF No. 61.

[16] *See id.*, Hearing Tr. 4/25/11, 16:23-17:8, 117:15-118:5, ECF No. 268; *id.*, Hearing Tr. 5/16/11, 10:3-15, ECF No. 347.

[17] *See Compass MAV*, Meyer Dep. 518:18-520:3.

16

becoming "friendly" with one of MIO's portfolio managers and "telling him … about the opportunities" in certain fixed income securities.[18] Although this process may have been acceptable for partners' personal investments, ERISA fiduciaries typically conduct a formal request for proposal process for investment managers, and place high value on firm stability, long-term performance record, and assets under management—characteristics that ESM lacked.

54.     Other joint investments reflect similar deficiencies. The Plans (through SSALT) were co-investors alongside McKinsey partners' private funds in a MIO-controlled United Kingdom company called Compass MCSGI Limited (Compass MCSGI). Per UK regulatory filings, the purpose of Compass MCSGI was to make "advances" to a group of younger managers (ages 23 to 32 at the time) to cover "build-out" expenses of a new investment fund. Regardless of the interest in McKinsey partners in financing younger managers' startups, this investment did not satisfy ERISA fiduciary standards in regard to the Plans.[19]

***Defendants burden the Plans with a disproportionate share of MIO's charge, and use the Plans to defray other partner expenses***

55.     MIO has consistently charged the Plans for its service managing certain portfolios that it has maintained as investment options in the Plans. Since 2013, MIO's charge to the Plans has ranged between $20 million and $36 million each year, with the high mark in the most recently reported year, 2017 (see *supra*, ¶ 32). This charge was unreasonably high and reflects the improper subsidization of MIO's services to partners.

---

[18] *See id.*

[19] These are only a few illustrations. MIO's investments on behalf of the Plans have included over 700 distinct holdings since 2009. Many holdings have no public information regarding MIO's investment process, the Plans' co-investors, or the purpose of the investment because the underlying vehicle is organized in a foreign jurisdiction that does not publish such information (or does not require that it be disclosed at all) and, to date, the holding has not been involved in a public court proceeding.

56.     MIO has consistently noted in regulatory filings that it may charge up to 1.00% for its services, but may waive *all* charges for "certain Fund investors". MIO's only clients are the Plans and McKinsey partner funds. Since the Plans always pay MIO (close to the full 1.00% in 2017—see *supra*, ¶ 32), MIO's fee waivers apply to partner funds only. This is improper, because MIO *jointly* invests the Plans' funds and partners' funds (see *supra*, ¶¶ 47-54). When the Plans pay MIO's expenses, but McKinsey partners do not, the Plans' participants subsidize MIO's services to partners (and pay more themselves). Under these circumstances, the continued retention of MIO by McKinsey constitutes a breach of fiduciary duty, and the payments that MIO received from the Plans during the class period (as well as the Plans' subsidization of McKinsey partners' investment expenses) violates ERISA's prohibited transaction rules (see *infra*, ¶¶ 96-106).[20]

57.     Had McKinsey's partners paid their fair share of MIO's expenses—i.e. the Plans and McKinsey's partners paid MIO's expenses in proportion to their proportionate share of MIO's assets under management—the Plans' expenses in MIO-managed investments likely would have been at least $70 million lower since 2013.

58.     MIO also reduced other expenses of McKinsey's partners by investing the Plans' funds alongside McKinsey partners' funds. Some underlying fund managers charge fees based

---

[20] All instances in which MIO waived charges to partner funds that were invested alongside the Plans' funds cannot be identified prior to discovery because MIO has not publicly disclosed each partner fund's underlying investments and MIO's charge to the fund, if any. There is, however, at least one example identified through public court documents. MIO manages a variable annuity account for McKinsey partners called the Security Benefit Life Insurance Company Variable Annuity Account IX (the "Security Benefit account"). The contract sates that MIO will "provide advisory services to the [Security Benefit account] without charge." *See SCM Group Inc. v. McKinsey & Company, Inc.*, Case No. 1:10-cv-2414, ECF No. 11-3, at 12 of 48 (S.D.N.Y. June 18, 2010). MIO invested the Security Benefit account alongside the Plans' funds in a vehicle called Palm Beach Finance Partners, L.P. (later revealed to be involved in the Tom Petters Ponzi scheme). *See In re Petters Company Inc., et al.*, Case No. 4:08-45258, ECF No. 41 (D. Minn. Bankr. Apr. 12. 2017).   The Plans paid MIO in connection with that investment, but the McKinsey partners' fund did not.

on assets invested, and fees may be negotiated. There also are fixed costs to pursuing certain investment strategies, like legal costs. By investing the Plans' funds alongside partners' funds, MIO obtained more favorable rates from other managers, and shifted part or all of the fixed costs to the Plans.

59.    Although the benefits of joint investing may appear to be mutual, it is the partners who benefit. MIO pursues its specialized, high-cost strategies to serve the needs of McKinsey partners (see *supra*, ¶¶ 50-51), and partners are better off by spreading those costs around. For the Plans, participants would be better off without MIO's specialized, high-cost strategies (see *supra*, ¶¶ 40-45). MIO's costs are far above what the Plans' participants would pay if the Plans were managed prudently and solely in their interest by an outside, independent investment manager (see *id.*).

### Defendants failed to install a neutral compensation scheme for MIO, and MIO has surrendered to its conflict

60.    Defendants also failed to institute a compensation scheme to secure MIO's impartiality. MIO selects and monitors the investment options available in the Plans, yet MIO only receives revenue if it includes options that it actively manages. This is an unreasonable impediment to MIO's duty to continuously monitor the Plans' investment options and replace imprudent ones (see *supra*, ¶ 35).

61.    A reasonable compensation scheme, designed to encourage impartiality, would impose a reasonable base charge for MIO's service selecting and monitoring investment options for the Plans. Then, if MIO selects MIO-managed portfolios after prudent, objective consideration of the alternatives, MIO's base fee would be offset by any revenue MIO receives as a result of selecting its own portfolios. However, this is not how MIO's compensation for its

services to the Plans was structured (nor did MIO waive charges to the Plans as it did for private partner investments).

62.     Instead, Defendants have depended on charges to MIO-managed investment options to compensate MIO for all services to the Plans (and, inappropriately, for services to McKinsey partners' private funds—see *supra*, ¶¶ 55-57). MIO has a disincentive to consider other managers' funds to replace MIO's portfolios, as MIO's revenue from the Plans would be reduced or eliminated.

63.     MIO has surrendered to this conflict. MIO has reorganized poor performing MIO-managed portfolios or mapped participants' assets to other MIO-managed portfolios, instead of considering other options in the marketplace. This has allowed MIO to maintain a consistent share of revenue-generating assets (see *supra*, ¶ 30) under its control, but it is contrary to the interest of the Plans' participants. MIO's portfolios are designed for McKinsey partners (see *supra*, ¶¶ 50-51), not the Plans' participants, and the Plans would fare better if MIO's portfolios were replaced with options typically offered in peer retirement plans (see *supra*, ¶¶ 41-45).

***McKinsey failed to prudently and impartially manage the Plan's recordkeeping program and control recordkeeping expenses***

64.     In addition to the foregoing failures with respect to the Plans' investment program, McKinsey failed to prudently and impartially manage the Plans' recordkeeping program and control recordkeeping expenses.

65.     Recordkeeping is a necessary service for any defined contribution plan. The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

66.     Generally, the cost of providing recordkeeping services depends on the number of unique participants served. The fact that the Plans are organized as two separate plans does not increase the reasonable rate for recordkeeping on a per-participant basis. The Plans are administered together, with the same investment menu, and a single account statement for each participant.

67.     Prudent fiduciaries will implement processes to aggressively manage and control recordkeeping costs. However, McKinsey failed to do so, and maintained an excessively-costly recordkeeping program for years that benefitted itself and its existing vendor at the expense of the Plans' participants.

68.     McKinsey has used the same outside recordkeeping unit, Aon/Alight,[21] since at least 2002. In addition, McKinsey itself has received recordkeeping compensation from the Plans since at least 2010.

69.     The amount of compensation that Aon/Alight and McKinsey receive is unreasonable and far above the norm for plans of similar size.

70.     McKinsey currently imposes an annual administrative charge of around $160 per participant. Of that amount, approximately $95 (or more) goes to recordkeeping services. Alight receives around $70 per participant, and McKinsey around $25 per participant.[22]

71.     This combined $95 amount is more than twice the market rate for recordkeeping services provided to similarly-sized plans. McKinsey could obtain the same level of service for the Plans at a total rate of $30 to $40 per participant (or less) by conducting a competitive bidding process.

---

[21] Aon sold its recordkeeping unit (and other business lines) to private equity investors in 2017, and that business in now known as Alight.

[22] Other portions of the $160 administrative charge may be allocated to recordkeeping services provided by vendors other than Aon/Alight and McKinsey.

72.     McKinsey's failure to prudently manage the Plans' recordkeeping costs is also demonstrated by the Plans' rising recordkeeping expenses. Between 2006 and 2016, recordkeeping costs on a per-participant basis have dropped marketplace-wide by approximately 50%. Yet since 2006, despite the number of participants increasing (which should have provided the Plans additional leverage to negotiate a lower per-participant rate), the Plans' per-participant recordkeeping fee has risen from $55 per participant in 2006 to the above-mentioned $95 per participant in 2017.

73.     Based on the above, it is apparent that McKinsey has failed to prudently and impartially discharge its fiduciary duty to monitor and control the Plans' recordkeeping expenses. The Plans' high recordkeeping costs, long tenure with one vendor, and McKinsey's extra charge for itself imply that McKinsey has failed to adequately monitor the marketplace, solicit competing bids through a periodic request for proposal process, or adopt other reasonable measures to reduce costs (including its own costs).

### PLAINTIFF LACKED OF KNOWLEDGE OF DEFENDANTS' ERISA VIOLATIONS.

74.     Plaintiff did not have knowledge of all material facts (including but not limited to the Plans' total costs compared to peer plans, the Plans' recordkeeping costs compared to rates available in the marketplace, the Plans' net returns compared to peer plans, MIO's investment process, MIO's services for McKinsey partners outside of the Plans, MIO's joint investments on behalf of the Plans and McKinsey partners, and MIO's waiver of expenses to partners in connection with joint investments) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until recently, shortly before this action was filed. Further, Plaintiff does not have actual knowledge of the specifics of the decision-making processes behind McKinsey's retention of MIO, Defendants'

management of the Plans' investment lineup and retention of MIO-managed portfolios, McKinsey's management of the Plans' recordkeeping function, and Defendants' overall management of the retirement program because such information is exclusively in the possession of Defendants prior to discovery.  For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

75.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to obtain for the Plans the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

76.     Plaintiff asserts his claims in Counts I–IV on behalf of a class of participants and beneficiaries of the Plans defined as follows:[23]

> All participants and beneficiaries of the Plans at any time on or after February 15, 2013, excluding Defendants, Defendants' employees with responsibility for the Plans' investment or administrative functions, and McKinsey partners (and their beneficiaries) during the time that any participant-partner was a partner.

77.     Numerosity:   The Class is so numerous that joinder of all Class members is impracticable. Each of the Plans had more than 10,000 participants during the applicable period.

78.     Typicality:    Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff is a participant in the Plans and suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiff consistently with other Class members with regard to the Plans. Defendants' imprudent and disloyal decisions affected all Class members similarly.

---

[23] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

79.   <u>Adequacy</u>:   Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

80.   <u>Commonality</u>:   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.   Whether Defendants are fiduciaries of the Plan;

    b.   The scope of each Defendant's fiduciary duties;

    c.   Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

    d.   Whether Defendants engaged in prohibited transactions by engaging in the conduct described herein;

    e.   Whether McKinsey breached its duty to monitor other Plan fiduciaries;

    f.   The proper form of equitable and injunctive relief; and

    g.   The proper measure of monetary relief.

81.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

82.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be

dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of particular investments from the Plans or removal of a fiduciary of the Plans, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plans that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of Class members.

83.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

### COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)-(B)

84.     As alleged above, Defendants are fiduciaries of the Plans and are subject to ERISA's fiduciary duties.

85.     ERISA imposes strict fiduciary duties of prudence and loyalty upon Defendants in their administration of Plans and in the selection and monitoring of investments and service providers.  *See* 29 U.S.C. § 1104.

86.     Defendants have breached these duties, and continue to breach these duties, by engaging in the conduct described herein.

87.     McKinsey (and the Doe Defendants at McKinsey with fiduciary responsibilities relating to the Plans) engaged in imprudent and disloyal conduct in violation of ERISA by retaining MIO as an investment manager to the Plans, failing to give proper consideration to alternative investment managers, failing to properly structure and monitor MIO's compensation arrangement, continuing to support MIO's flawed investment program for the Plans despite evidence that it was not succeeding, failing to control the Plans' investment-related expenses, failing to properly monitor the Plans' investment performance, retaining speculative investments in the Plans, subverting the interests of Plan participants to McKinsey partners, retaining McKinsey to perform recordkeeping services for the Plans, failing to give proper consideration to alternative recordkeeping service providers (other than itself and Aon/Alight), failing to prudently monitor and control the Plans' recordkeeping expenses, failing to engage in a prudent and loyal process for managing the Plans, and engaging in the other conduct referenced in this Complaint.

88.     MIO (and the Doe Defendants at McKinsey with fiduciary responsibilities relating to the Plans) engaged in imprudent and disloyal conduct in violation of ERISA by failing to engage in an appropriate process for managing the Plans' investments that was not tainted by conflicts of interest, failing to control the Plans' investment-related expenses, failing to properly monitor the Plans' investment performance, retaining speculative investments, subverting the

interests of Plan participants to those of McKinsey partners, and engaging in the other conduct referenced in this Complaint.

89.     As a consequence of Defendants' breaches of fiduciary duty, Class members suffered millions of dollars in losses due to excessive fees and lost investment returns. Defendants are liable to make good to the Plans all losses suffered by such Class members  a result of Defendants' fiduciary breaches, and to disgorge all profits resulting from Defendants' unlawful conduct, in addition to further equitable and injunctive relief.

## COUNT II
### Failure to Monitor Fiduciaries
### U.S.C. § 1132(a)(3)

90.     As alleged above, McKinsey is the sponsor of the Plans and a fiduciary of the Plans under 29 U.S.C. §§ 1002(21) and 29 U.S.C. § 1102(a).

91.     McKinsey appointed MIO and the Doe Defendants to assist it in carrying out its fiduciary functions, and its appointees are also fiduciaries of the Plans.

92.     McKinsey has a duty to monitor the performance of its fiduciary appointees under ERISA, and ensure that its appointed fiduciaries are performing their fiduciary obligations in compliance with ERISA.  *See* 29 C.F.R. § 2509.75-8, FR-17.

93.     McKinsey breached its fiduciary monitoring duties by, among other things:

    a) Failing to monitor and evaluate the performance of the Plans' fiduciaries, or have a system in place for doing so, standing idly by as the Plans suffered substantial losses as a result of the imprudent actions and omissions of MIO and the Doe Defendants;

27

b) Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein;

c) Failing to implement a system to avoid conflicts of interest that tainted the decisions made by the fiduciaries it appointed; and

d) Failing to remove fiduciaries whose performance was inadequate in that they continued to maintain investments that a prudent fiduciary would not have retained in the Plans, all to the detriment of the Plans and Plans participants' retirement savings.

94.     As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars per year in losses due to excessive fees and lost investment earnings.

95.     Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), McKinsey is liable to restore to the Plans all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor the Plans' fiduciaries, including MIO and the Doe Defendants.

## COUNT III
### Prohibited Transactions with a Party in Interest
### 29 U.S.C. § 1106(a)(1)

96.     As alleged throughout this Complaint, Defendants are both fiduciaries of the Plans, service providers to the Plans, and for McKinsey, employers of participants in the Plan. Defendants are therefore parties in interest with respect to the Plans under 29 U.S.C. § 1002(14)(A)-(C). In addition, because McKinsey owns MIO, MIO is a party in interest to the Plans under 29 U.S.C. § 1002(14)(G). Finally, McKinsey partners are also parties in interest to the Plans under 29 U.S.C. § 1002(14)(H).

97.     As described throughout the Complaint, Defendants have caused the Plans to engage in transactions with themselves for investment services and recordkeeping services, for the benefit of themselves and McKinsey partners. These transactions took place on a periodic basis throughout the class period as Defendants were paid for their services.

98.     These transactions constituted a direct or indirect furnishing of services between the plans and a party in interest, a direct or indirect transfer of assets of the plan to a party in interest, a furnishing of goods and services between the Plans and a party in interest, a transfer of assets of the plan for use by a party in interest, and a transfer of the assets of a plan for the benefit of a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(C), (D).

99.     The amounts paid to Defendants were excessive, unreasonable, and not properly incurred by the Plans.

100.    As a direct and proximate result of these prohibited transactions, Class members directly or indirectly paid tens of millions of dollars in fees to Defendants, and also suffered lost investment earnings, in connection with transactions that were prohibited under ERISA. Defendants are liable to make good to the Plans all losses suffered as a result of these prohibited transactions, and to disgorge all profits associated with their unlawful conduct. In addition, Class members are entitled to further equitable and injunctive relief on account of these prohibited transactions.

## COUNT IV
### Prohibited Transactions with a Fiduciary
### 29 U.S.C. § 1106(b)

101.    As alleged throughout this Complaint, Defendants are fiduciaries to the Plans.

102.    Acting in a fiduciary capacities, MIO improperly directed assets of the Plans to itself for its own benefit. This took place on a periodic basis throughout the class period as MIO

directed the Plans' assets into MIO-managed investments for which it was paid various management fees. These payments also constituted consideration for MIO's personal accounts in connection with a transaction involving the assets of the Plans.

103.    Similarly, McKinsey directed assets of the Plans to itself to pay for administrative and recordkeeping expenses throughout the class period. In so doing, McKinsey dealt with the assets of the Plans in its own interest, and received consideration for its personal account in connection with a transaction involving the assets of the Plans.

104.    Additionally, because McKinsey's partners personally benefited from the Plans' exclusive and entire payment of MIO's expenses, and thus had an incentive for the Plans to pay a greater, not smaller, level of fees to MIO, both MIO and McKinsey acted in transactions involving a party whose interests were adverse to the interests of the Plans and the Plans' participants.

105.    These payments and services were prohibited under ERISA.  Defendants dealt with the Plans' assets in their own interests and for their own accounts, in violation of 29 U.S.C. § 1106(b)(1), acted in a transaction involving the Plans with a party whose interests were adverse to those of the Plans, in violation of 29 U.S.C. § 1106(b)(2), and received consideration for their personal accounts in connection with transactions involving assets of the Plans, in violation of 29 U.S.C. § 1106(b)(3).

106.    As a direct and proximate result of these prohibited transactions, Class members directly or indirectly paid tens of millions of dollars in fees to Defendants, and also suffered lost investment returns, in connection with transactions that were prohibited under ERISA. Defendants are liable to make good to participants all losses suffered as a result of Defendants' prohibited transactions, and to disgorge all profits associated with their unlawful conduct. In

addition, Class members are entitled to further equitable and injunctive relief on account of these prohibited transactions.

**PRAYER FOR RELIEF**

107.    Wherefore, Plaintiff, individually and as a representative of the Class, prays for relief as follows:

a.  A determination that this action may proceed as a class action under Federal Rule of Civil Procedure 23;

b.  Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

c.  A declaration that Defendants have breached their fiduciary duties under ERISA;

d.  A declaration that Defendants violated 29 U.S.C. § 1106 by engaging in prohibited transactions;

e.  An order compelling Defendants to make good all losses incurred as a result of the breaches of fiduciary duties and prohibited transactions described above;

f.  An accounting for profits earned by Defendants in connection with the breaches of fiduciary duties and prohibited transactions described above, and a subsequent order requiring Defendants to disgorge all such profits received;

g.  An order enjoining Defendants from any further violations of ERISA;

h.  Other equitable relief to redress the practices described herein and to enforce the provisions of ERISA;

i.  An award of pre-judgment interest;

j.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

k.  An award of such other and further relief as the Court deems just and equitable.

Dated February 15, 2019                    **NICHOLS KASTER PLLP**

                                           /s/ Michelle L. Kornblit
                                           Michelle L. Kornblit, NY Bar Code #5314794

Kai H. Richter, MN Bar No. 0296545*
Carl F. Engstrom, MN Bar No. 0396298*
Paul Lukas, MN Bar No. 22084X*
Brandon T. McDonough, MN Bar No. 0393259*
Brock J. Specht, MN Bar. No. 0388343*
      * *pro hac vice* application forthcoming
4600 IDS Center, 80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
mkornblit@nka.com
krichter@nka.com
cengstrom@nka.com
lukas@nka.com
bmcdonough@nka.com
bspecht@nka.com